Charles R. WOODRUFF et al., Appellants,

v.

ST. LOUIS SOUTHWESTERN RAILWAY LINES, Appellee.

No. 4998.

Court of Civil Appeals of Texas, Waco.

Aug. 24, 1972.

Rehearing Denied Sept. 14, 1972.

Mullinax, Wells, Mauzy & Collins, Gardere, Porter & DeHay, Dallas, for appellants.

Worsham, Forsythe & Sampels, Robert A. Wooldridge, Dallas, for appellee.

HALL, Justice.

Plaintiff, Charles R. Woodruff, while driving a tractor-trailer for his employer, Illinois-California-Express, was in collision with a train being operated by defendant, St. Louis Southwestern Railway Lines, at the place of intersection of defendant's track with Josey Lane in the City of Carrollton. The collision caused substantial personal injuries to Woodruff and he brought this action for his damages. His employer brought a separate action for damages to its truck. The two suits were consolidated. Later, Transport Indemnity Company, the workmen's compensation insurer for Illinois-California-Express, intervened, seeking recovery of benefits and medical expenses it had paid to Woodruff, and, in effect, assumed the position of plaintiff in the case.

Among other defenses, defendant pleaded that Woodruff violated Sections 86(c) and 86(d) of Article 670ld, Vernon's Ann. Civ.St., and that these were proximate causes of the collision. The statutory provisions read as follows:

"Sec. 86. Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

" * * *;

"(c) A railroad engine approaching within approximately fifteen hundred (1500) feet of the highway crossing emits a signal audible from such distance and such engine by reason of its speed or nearness to such crossing is an immediate hazard;

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

Trial was to a jury which made findings that defendant committed several acts of negligence which were proximate causes of the collision, and which made findings on damages. Additionally, answering special issues numbered as follows, the jury found (20) that "when the engine of the defendant's train was within approximately 1500 feet of the crossing it emitted a signal which was audible from that distance"; (22) that "the train was in hazardous proximity to the crossing before Woodruff reached a point fifteen feet from the nearest rail of the track on which the train was approaching"; (23) that Woodruff "failed to stop his vehicle within fifty feet, but not less than fifteen feet, from the nearest rail of the track on which the train was approaching"; and (24) that such failure was a proximate cause of the collision.

The court instructed the jury that a train "is 'in hazardous proximity to the crossing' if the speed or nearness of the train is such that a driver, situated as was Woodruff and using ordinary care for his own safety, would reasonably conclude that he cannot pass over the crossing without danger of collision."

This appeal is from a judgment rendered on the verdict that plaintiffs recover nothing.

In Swonke v. Hildebrandt Engineering Company (Tex.Civ.App., 1965, writ ref., n. r. e.) 389 S.W.2d 355, 357, we held that a motorist is under an absolute duty to stop when the conditions enumerated in Section 86(c), Article 670ld, are shown to exist. We said, "These are: (1) the engine must be 'approaching' (2) within approximately 1500 feet of the crossing, (3) emitting an audible signal, and (4) the engine, by reason of its speed and proximity must be an immediate hazard." And in Missouri Pacific Railroad Co. v. Burns (Tex.Civ.App., 1964, no writ hist.) 382 S.W.2d 761, find-

ings were made that are, in effect, identical to those made in answer to issues 20, 22, and 23 by the jury in this case. This court held that they convicted plaintiff of a violation of Sec. 86(c), Article 6701d; and that, along with a finding of proximate cause, they required a judgment in favor of the defendant railroad company.

Plaintiffs contend that there is no evidence to support the answer to issue No. 24 (the proximate cause finding), or, alternatively, that the answer is against the great weight and preponderance of the evidence. Defendant asserts that the statutory violation was both negligence and proximate cause as a matter of law; and that, in any event, the evidence is legally and factually sufficient to support the proximate cause finding.

■ The rules by which we must determine whether there is any evidence in the record to support the challenged finding are well settled. They require us to accept as true any legally competent evidence in the record that supports the finding; to resolve all conflicts and inconsistencies in the evidence in favor of the finding; to interpret the evidence and all reasonable inferences to be drawn therefrom in favor of the finding; and to disregard the evidence and inferences that are against the finding. McLain v. Hodge (Tex.Civ.App., 1972, writ ref. n. r. e.) 474 S.W.2d 772, 774. Briefly reviewed in this light, the record supports the following facts.

The collision occurred at 4:30 P.M. on a "mild, clear, sunny day." Woodruff was familiar with the crossing, and had traveled it at least eight times previously. The crossing contains a single set of tracks which run generally east and west. The tracks curve slightly to the south on either side of the crossing. Josey Lane is perpendicular to the track. Shortly before the collision, Woodruff and one Dan Rhodes, driving separate trucks, turned south onto Josey Lane at a point about five hundred feet north of the track. From that point to the track, Josey Lane inclines upward,

and the incline is "moderately steep." Rhodes was 150 to 200 feet ahead of Woodruff. Rhodes' load was 20,000 pounds and Woodruff's load was 18,000 pounds. Both were traveling in low range gear, and Woodruff's speed was five to fifteen miles per hour. The train was traveling east at a speed of thirty to thirty-five miles per hour. As the train approached a whistleboard located approximately one-fourth mile from the crossing the engineer began blowing the train's "trumpet type" horn, and continued doing so until after it had passed the crossing. The bell of the train was ringing before the whistleboard was reached, and continued ringing through the crossing. The bell makes a "loud dinging-noise" and can be heard for a distance of at least one-fourth mile.

Claude Eugene Meyer and William Ramon Chambers witnessed the collision. Meyer was about 250 yards northeast of the crossing on a company parking lot. Meyer and Chambers' wife work for the company. Meyer was preparing to go home, and Chambers was waiting for his wife. Meyer's attention was attracted toward the crossing because he heard "a continuous or several blasts from a horn on a train. It was blowing excessively, a long period of time * * * excessively from what it normally does." He "observed the train coming down the track and the truck approaching the crossing." When he first saw them the train was 75 to 100 yards west of the crossing, and Woodruff's truck was 25 to 30 yards north of the track. There was no change in the speed of the train or the truck until the collision. They reached the crossing at the same time, and the tractor was struck by the train.

Chambers heard the train horn blowing, and looked toward the southwest to watch for the train. He was "300 yards or better" northeast of the crossing. He saw the trucks going south on Josey Lane toward the crossing. At that time, Woodruff's truck was about 350 feet north of the track, and Rhodes' truck was about 200

feet in front of Woodruff. Chambers continued watching and continued to hear the train horn. The trucks appeared to be heavily loaded. Their engines were running at a "high rpm" and they were in "low range gear." The train horn continued to blow, and just as the lead truck started to cross the track "the train set down on his horn, one of his long blasts." At that time the train came into the vision of Chambers. It was "around four or five hundred feet" from the crossing; and Woodruff's truck, which was between Chambers and the train, was "around a hundred feet or better" from the crossing. Both train and truck continued into the crossing without changing speeds.

Including reaction time, on the occasion in question, at a speed of 10 miles per hour Woodruff could have stopped his truck in 17½ feet; at a speed of 12 miles per hour he could have stopped it in 22 feet; and at a speed of 15 miles per hour he could have stopped it in 31 feet.

■ While there is additional evidence in the record that supports the jury's answers to issues 20, 22, 23 and 24, we are of the opinion that the evidence we have recited is legally sufficient to support them. Moreover, an examination of the entire record convinces us that those findings are not against the great weight and preponderance of the evidence.

The defendant argues that, as shown above, the definitions of "immediate hazard" or "hazardous proximity" as used in Section 86(c) and 86(d) of Article 6701d, include the element of foreseeability—that is, that a motorist "using ordinary care for his own safety would reasonably conclude that he cannot pass over the crossing without danger of collision"—and, therefore, a finding of a violation of the conditions of either statutory section is a finding of proximate cause as a matter of law. In view of our holdings that the evidence is sufficient to support the jury's finding of proximate cause, it is not necessary for us to answer this question.

Rhodes testified that as he crossed the tracks he saw the train coming from the west; that, after clearing the tracks he stopped his truck, walked to its rear, and began waving his arms to warn Woodruff; that Woodruff was "a short distance north of the track"; that Woodruff looked to the west, then to the east, "then he came back and looked at me"; that Woodruff looked to the west again, and at that time "reared up to come down on his brakes"; then the train hit the cab. Woodruff testified that at about 200 feet before reaching the track he looked to the west and then to the east and didn't see anything; that when he was about 35 feet from the track, he again looked to the west but "didn't see anything from there, either"; and "about the same time I saw Mr. Rhodes jump out of his tractor * * * and he had his arm in the air at the time, but that's all I saw. He jumped out of his tractor * * * and that was all I remember."

■ Based upon the testimony of Rhodes and Woodruff, plaintiffs requested a cluster of issues seeking findings that Woodruff was "distracted from seeing defendant's train" by reason of Rhodes' actions, and that the distraction was "reasonable", as an excuse for Woodruff's negligence. By several points of error, plaintiffs complain of the court's refusal to submit the issues.

We doubt that the "distraction" by Rhodes, if assumed to be true, would excuse Woodruff's negligence under the tests laid down by our Supreme Court. See Christy v. Blades (Tex.Sup., 1969) 448 S.W. 2d 107; Impson v. Structural Metals, Inc. (Tex.Sup., 1972), 15 Texas Supreme Court Journal 443. In any event, the requested issues inquire as to whether or not Woodruff was distracted from *seeing* the train, and none were requested asking whether or not he was distracted from *hearing* the train. The refused issues could not, therefore, constitute an excuse for violating Sec. 86(c) of Article 6701d, and no reversible error is shown in the court's ruling thereon.

Plaintiffs have other points and contentions. All have been carefully considered, found to be without merit, and are overruled.

The judgment is affirmed.